**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Faye L. Harris, | : | Case No. 3:12 CV 2302 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Faye L. Harris ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 19 and 20) and Plaintiff's Reply (Docket

No. 21). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner

be affirmed.

## II. PROCEDURAL BACKGROUND

1

On October 24, 2008, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 13, pp. 173-79 of 434). On that same

day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 13, pp. 180-82 of 434). In both applications, Plaintiff alleged a period of disability

beginning October 10, 2008 (Docket No. 13, pp. 173, 180 of 434). Plaintiff's claims were denied

initially on March 10, 2009 (Docket No. 13, pp. 84-86, 158-61 of 434), and upon reconsideration on

June 22, 2009 (Docket No. 13, pp. 89-91, 92-94 of 434). Plaintiff thereafter filed a timely written

request for a hearing on August 25, 2009 (Docket No. 13, pp. 95-96 of 434).

On April 19, 2010, Plaintiff appeared with counsel for a hearing before Administrative Law

Judge Melissa Warner ("ALJ Warner") (Docket No. 13, pp. 3-40 of 434). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 13, pp. 29-40 of 434). ALJ Warner

found Plaintiff to have a severe combination of hypertension, hypertensive headaches, bladder

dysfunction, and a history of myocardial infarction and coronary artery disease with vascular stenting

with an onset date of October 10, 2008 (Docket No. 13, p. 37 of 434).

Despite these limitations, ALJ Warner determined, based on all the evidence, that Plaintiff had

not been disabled within the meaning of the Social Security Act at any time from the alleged onset date

through the date of her decision (Docket No. 13, p. 42 of 434). ALJ Warner found Plaintiff had the

residual functional capacity to perform light work with the following exceptions:

1.    Plaintiff can lift five pounds occasionally
2.    Plaintiff can sit, stand, or walk for six hours out of an eight-hour workday
3.    Plaintiff can push or pull without limitation
4.    Plaintiff can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl
5.    Plaintiff can never climb ladders or the like
6.    Plaintiff can perform manipulative functions without restriction
7.    Plaintiff can see, hear, and speak without limitation
8.    Plaintiff can perform work in environments with occasional exposure to temperature

2

extremes, humidity, respiratory irritants, and hazards
9.      Plaintiff needs to wear sunglasses
10.    Plaintiff needs to take one unscheduled five-minute bathroom break per non-break hour

(Docket No. 13, p. 37 of 434). Plaintiff's request for benefits was therefore denied (Docket No. 13, p.

42 of 434).

On September 12, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western

Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading,

Plaintiff alleged the ALJ erred by: (1) finding Plaintiff capable of performing a semi-skilled job

without making a finding regarding transferable skills; and (2) relying on the testimony of the VE

regarding jobs that allegedly require employer accommodations (Docket No. 19). Defendant filed its

Answer on December 26, 2012 (Docket No. 12).

### III.  FACTUAL BACKGROUND

**A.**    **THE ADMINISTRATIVE HEARING**

An administrative hearing convened on November 19, 2010, in Toledo, Ohio (Docket No. 14).

Plaintiff, represented by counsel Steven Perlmutter, appeared and testified (Docket No. 14, pp. 9-29 of

40). Also present and testifying was VE George Coleman, III ("VE Coleman") (Docket No. 14, pp. 29-

40 of 40).

**1.**    **PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was a forty-eight-year old single female who resided with

her mother (Docket No. 14, pp. 10-11 of 40). Plaintiff has a high school education and attended

approximately one and a half years of college (Docket No. 14, p. 12 of 40). Plaintiff indicated that,

while she does have a driver's license and is able to drive, she does not drive because she does not

have a car (Docket No. 14, p. 11 of 40). According to Plaintiff, her primary obstacles in returning to

3

work are her heart issues and her migraine headaches (Docket No. 14, p. 21 of 40).

      Plaintiff testified about a number of her impairments, including cardiac issues, hypertension, hand pain, and bladder incontinence (Docket No. 14, pp. 9-29 of 40). With regard to her cardiac issues, Plaintiff indicated that she is tired all of the time (Docket No. 14, p. 13 of 40). She last saw her cardiologist in February 2009 but has not been able to return because of insurance problems (Docket No. 14, p. 20 of 40). Plaintiff also indicated that she does not take her prescription medications because she cannot afford them (Docket No. 14, p. 13 of 40). Instead, Plaintiff just takes her water pill and an aspirin (Docket No. 14, p. 13 of 40).

      Plaintiff indicated that she has also been prescribed medication for her hypertension, which she has not had filled due to its cost (Docket No. 14, p. 14 of 40). She suffers from migraine headaches associated with her high blood pressure, sometimes experiencing these headaches four to five times per month (Docket No. 14, pp. 15, 21 of 40). Plaintiff stated that these headaches typically last one day, are "real throbby," and are accompanied by light sensitivity (Docket No. 14, pp. 21-22 of 40). When asked how she treats these headaches, Plaintiff testified that she takes Aleve if she catches the headache in time; otherwise, she mostly sleeps it off (Docket No. 14, pp. 21-22 of 40).

      In 2005, Plaintiff underwent surgery to correct her stress incontinence issues (Docket No. 14, p. 16 of 40). Plaintiff testified that her problems have since returned and are not well-controlled through typical methods such as bladder leakage pads or adult diapers (Docket No. 14, pp. 16-17 of 40). This issue forces her to change her clothes multiple times per day and she must use the restroom seven to eight times per day, including the evening and nighttime hours (Docket No. 14, pp. 17, 19, 27-28 of 40). Plaintiff indicated that another corrective surgery was scheduled, but was cancelled when Plaintiff did not receive the necessary cardiac clearance (Docket No. 14, pp. 17-18 of 40).

4

Plaintiff also gave testimony concerning swelling in her hands (Docket No. 14, pp. 15-16 of 40). According to Plaintiff, her hands swell and develop a rash (Docket No. 14, p. 15 of 40). Plaintiff indicated that this has happened only twice since 2005 (Docket No. 14, p. 16 of 40). Plaintiff testified that she has some trouble sleeping, often waking up in the middle of the night and watching television for two to three hours (Docket No. 14, p. 22 of 40). Plaintiff lies down three to four times during the day for a total of two to three hours per day, but does not always nap (Docket No. 14, p. 23 of 40).

With regard to residual functional capacity, Plaintiff stated that she can do light housework such as dishes, light dusting, and, within moderation, cleaning the bathrooms (Docket No. 14, p. 24 of 40). Plaintiff cooks for herself and her mother, and is able to shower, dress, and feed herself (Docket No. 14, pp. 24-25 of 40). Plaintiff can stand for one to two hours and can bend and squat down, although not too low (Docket No. 14, pp. 25-26 of 40). Plaintiff stated that she can sit for two to three hours at a time, but then has to get up because of her incontinence issues (Docket No. 14, p. 25 of 40). She can pick up or lift at least five pounds, including a gallon of milk (Docket No. 14, p. 26 of 40). She can also walk to her aunt's house, which is three houses down from her own, without getting tired (Docket No. 14, p. 25 of 40). She does not have any trouble with social activities (Docket No. 14, p. 27 of 40).

## 2.    VOCATIONAL EXPERT TESTIMONY

VE Coleman testified that he had familiarized himself with Plaintiff's file and vocational background prior to the hearing (Docket No. 14, pp. 30-31 of 40). ALJ Warner then posed her first hypothetical question:

> Let's first assume a hypothetical individual vocationally situated as is the claimant who can perform all the functions of light work except occasional stairs, balancing, stooping, kneeling, crouching, and crawling. No climbing of ladders, scaffolds and such. Occasional exposure to temperature extremes, humidity, respiratory irritants and hazards . . . Could

5

such an individual perform the claimant's past relevant work?

(Docket No. 14, p. 32 of 40). Taking into account these limitations, the VE testified that Plaintiff could perform her previous work as a cashier/retail clerk (Docket No. 14, p. 33 of 40).

ALJ Warner then expanded on this hypothetical, inquiring as to whether the hypothetical individual would be allowed to wear sunglasses if bothered by bright lights (Docket No. 14, p. 44 of 40). Drawing upon his professional experience, the VE stated that such a condition would be an acceptable accommodation (Docket No. 14, p. 33 of 40).

ALJ Warner then posed her second hypothetical question:

Let's assume the same hypothetical individual who would need unscheduled five minute bathroom breaks during every non-break hour. In other words during the time period . . . the morning and afternoon and lunchtime breaks that would be the break, but during other times they would need these five minute unscheduled bathroom breaks. Would that person be able to perform the claimant's past relevant work?

(Docket No. 14, p. 33 of 40). VE Coleman indicated that this accommodation would hinder performance of Plaintiff's past relevant work as a cashier/retail clerk (Docket No. 14, p. 34 of 40). However, the VE indicated that there are other jobs that such an individual could perform, including: (1) appointment clerk, DOT 237.367-010, for which there are 1,062,100 positions nationally and 1,610 regionally; (2) personal records clerk, DOT 209.362-026, for which there are 161,900 positions nationally and 270 regionally; and (3) credit clerk, DOT 205.367-022, for which there are 195,300 positions nationally and 170 regionally[1] (Docket No. 14, pp. 35-36 of 40). The VE stated that these positions were still valid even when the hypothetical individual was restricted to a sedentary level of exertion (Docket No. 14, p. 36 of 40).

---

[1] VE Coleman defined the region as Fulton, Lucas, Ottawa, and Wood Counties (Docket No. 14, p. 35 of 40).

6

During cross-examination, Plaintiff's counsel inquired as to whether, given a weight restriction of *less than* five pounds, these positions would be eliminated (Docket No. 14, pp. 36-37 of 40). VE Coleman indicated that, given that the sedentary exertional level requires the occasional lifting of up to ten pounds, such a restriction would eliminate these other jobs (Docket No. 14, p. 37 of 40).

Based on counsel's question, ALJ Warner posed a third hypothetical question:

> If the individual could basically stand or, sit, stand or walk for the six hours in a day, that would be ordinary for the light work which is where I started. And then the occasional stairs, balancing, stooping, kneeling, crouching, crawling, no climbing of ladders and the like, occasional exposure to temperature extremes, humidity, respiratory irritants, hazards and the sunglasses, and then we added on the unscheduled five minute bathroom breaks during non-break hours. And as far as lifting and carrying, we're at five pounds. That individual can do the appointment clerk and credit clerk jobs?

(Docket No. 14, p. 38 of 40). VE Coleman answered in the affirmative (Docket No. 14, p. 39 of 40).

## B.  MEDICAL RECORDS

### 1.  STRESS INCONTINENCE

Plaintiff's medical records regarding her stress urinary incontinence date back to January 20, 2005, when Plaintiff first saw her treating urologist, Dr. Gregory Haselhuhn, MD ("Dr. Haselhuhn") (Docket No. 13, p. 433 of 434). Plaintiff began complaining of incontinence after a hysterectomy and noted that she had to use bladder leakage protection (Docket No. 13, p. 433 of 434). On March 7, 2005, Plaintiff underwent a cystoscopy[2] and video urodynamics to treat her stress incontinence (Docket No. 13, p. 393 of 434). Six weeks later, on April 28, 2005, Plaintiff underwent installation of an urethral sling (Docket No. 13, p. 414 of 434). During a follow-up appointment with Dr. Haselhuhn on June 2, 2005, Plaintiff indicated that she was "very pleased" with the results of her surgery and

---

[2] The examination of the interior of the urinary bladder by looking into it through a specially constructed tube-like instrument (a cystoscope) provided with lenses and a light. ATTORNEYS' DICTIONARY OF MEDICINE, C-31309 (2009).

denied any issues of stress or urge incontinence (Docket No. 13, p. 413 of 434).

Plaintiff's records concerning her stress incontinence then jump to May 21, 2009, when she returned to Dr. Haselhuhn again complaining of stress urinary incontinence (Docket No. 13, p. 391 of 434). Appointment notes indicate that Plaintiff's incontinence returned sometime in 2008 (Docket No. 13, p. 391 of 434). Plaintiff reported that she was able to get to the bathroom "most of the time" (Docket No. 13, p. 391 of 434). She was scheduled for a transurethral injection of Coaptite®[3] (Docket No. 13, p. 392 of 434). Plaintiff underwent a second Coaptite® injection on July 2, 2009 (Docket No. 13, p. 406 of 434). By her follow-up appointment on July 24, 2009, Plaintiff reported being "perfectly dry" (Docket No. 13, p. 404 of 434).

Plaintiff returned to Dr. Haselhuhn on March 25, 2010, again complaining of urinary incontinence (Docket No. 13, p. 401 of 434). Plaintiff stated that she was leaking very minimally, did not need to wear leakage protection, and was "very satisfied" with her urinary status (Docket No. 13, p. 401 of 434). By September 23, 2010, Plaintiff reported going through two to three bladder leakage pads per day (Docket No. 13, p. 396 of 434). Plaintiff was diagnosed with stress urinary incontinence due to an intrinsic sphincter deficiency (Docket No. 13, p. 397 of 434). She was sent for another Coaptite® injection (Docket No. 13, p. 397 of 434).

### 2.   CARDIAC ISSUES/HYPERTENSION

On October 10, 2008, Plaintiff presented to the Toledo Hospital Emergency Room complaining

---

[3] Coaptite® is a permanently implanted device used to treat women who have stress urinary incontinence due to poorly functioning urethral sphincter muscles. The device is a toothpaste-like gel that is injected into the wall of the urethra near the bladder. After injection, Coaptite® bulks the wall of the urethra to help prevent uncontrolled urination. U.S. FOOD AND DRUG ADMINISTRATION, http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/Recently-ApprovedDevices/ucm078444.htm (last visited May 30, 2013).

of chest pain that was accompanied by nausea, vomiting, and shortness of breath (Docket No. 13, p. 310 of 434). Plaintiff indicated that she smoked one pack of cigarettes every two days (Docket No. 13, p. 310 of 434). After an EKG, Plaintiff was given nitro for her pain (Docket No. 13, p. 311 of 434). When this did not work, she was given morphine (Docket No. 13, p. 311 of 434). Plaintiff's lab work came back as "significantly abnormal" and Plaintiff was admitted to the hospital for a myocardial infarction[4] and acute coronary syndrome (Docket No. 13, p. 311 of 434). Plaintiff subsequently underwent an emergency cardiac catheterization with stent placement (Docket No. 13, pp. 312, 334-42 of 434). Plaintiff was advised to stop smoking (Docket No. 13, p. 313 of 434).

On October 29, 2008, Plaintiff followed up with her treating cardiologist, Dr. Fadhil Hussein, MD ("Dr. Hussein") (Docket No. 13, p. 365 of 434). Plaintiff complained of fatigue but was stable and completely angina free (Docket No. 13, p. 365 of 434). Her hypertension was well-controlled (Docket No. 13, p. 365 of 434). Plaintiff returned to Dr. Hussein on January 30, 2009, complaining of chest pain and exertional dyspnea (Docket No. 13, p. 364 of 434). Plaintiff was sent for a cardiac catheterization (Docket No. 13, p. 364 of 434). Plaintiff underwent this catheterization on February 4, 2009 (Docket No. 13, pp. 354-60 of 434). On February 19, 2009, Dr. Hussein reported that Plaintiff was stable and angina free (Docket No. 13, p. 363 of 434). Her hypertension was well-controlled (Docket No. 13, p. 363 of 434).

C.    **EVALUATIONS**

On March 9, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment

---

[4] Infarction involving the muscular wall of the heart, usually as a result of an occlusion (blockage) of a coronary artery. ATTORNEYS' DICTIONARY OF MEDICINE, M-77762 (2009).

with state examiner Dr. Anton Freihofner, MD ("Dr. Freihofner") (Docket No. 13, pp. 366-73 of 434).

Dr. Freihofner reported that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2)

frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-

hour workday; (4) sit for a total of six hours during an eight-hour workday; (5) engage in unlimited

pushing and pulling; (6) occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and

(7) frequently climb ladders, ropes, and scaffolds (Docket No. 13, pp. 367-68 of 434).  Plaintiff had no

manipulative, visual, communicative, or environmental limitations (Docket No. 13, pp. 369-70 of 434).

On November 15, 2010, Plaintiff's treating family physician, Dr. Hamid Riaz, MD ("Dr. Riaz")

completed an evaluation at the request of the Ohio Department of Job and Family Services ("ODJFS")

(Docket No. 13, pp. 386-88 of 434).  Dr. Riaz described Plaintiff's health status as "poor but stable"

(Docket No. 13, p. 387 of 434).  He found that Plaintiff: (1) could stand/walk for one to two hours

during an eight-hour workday; (2) could lift and/or carry up to five pounds frequently; and (3) was

only moderately limited in bending and repetitive foot movements (Docket No. 13, p. 388 of 434).  Dr.

Riaz found Plaintiff to be employable with these restrictions (Docket No. 13, p. 388 of 434).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v.*

*Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . .  physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

11

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Warner made the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.

2.  Plaintiff has not engaged in substantial gainful activity since October 10, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: history of myocardial infarction and coronary artery disease with vascular stenting, hypertension, hypertensive headaches, and bladder dysfunction.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform light work with the following limitations: (1) lift five pounds occasionally; (2) sit, stand, or walk for six of eight hours during each work day; (3) push or pull without limitation; (4) occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; (5) never climb ladders and the like; (6) perform any manipulative functions; (7) see, hear, and speak without limitation; and (8) work in environments with occasional exposure to temperature extremes, humidity, respiratory irritants, and hazards. Plaintiff needs to wear sunglasses and take one unscheduled five-minute break per non-break hour.

6.  Plaintiff is unable to perform any past relevant work.

12

7.      Plaintiff was born on November 21, 1961, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.     Plaintiff has not been under a disability, as defined in the Social Security Act, from October 10, 2008, through the date of this decision.

(Docket No. 13, pp. 34-42 of 434). ALJ Warner denied Plaintiff's request for DIB and SSI benefits

(Docket No. 13, p. 42 of 434).

**VI. STANDARD OF REVIEW**

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleged that the ALJ erred by: (1) finding Plaintiff capable of performing a semi-skilled job without making a finding regarding transferable skills; and (2) relying on the testimony of the VE regarding jobs that allegedly require employer accommodations (Docket No. 19).

### B. DEFENDANT'S RESPONSE

Defendant contends that the ALJ properly found that Plaintiff could perform other work, given that the transferability of Plaintiff's skills is immaterial (Docket No. 20, pp. 8-11 of 15). Defendant also argues that the ALJ did not err by relying on the VE's testimony regarding Plaintiff's required additional accommodations (Docket No. 20, pp. 11-14 of 15).

### C. DISCUSSION

#### 1. TRANSFERABILITY OF SKILLS

Plaintiff contends that ALJ Warner erred in determining that she was capable of performing the jobs identified by the VE, namely appointment clerk and credit clerk, without identifying any transferable skills from Plaintiff's past relevant work (Docket No. 19, pp. 7-10 of 12). According to Plaintiff, this failure to identify transferable skills violates Social Security Rulings 83-10 and 82-41 (Docket No. 19, pp. 7-10 of 12).

14

Plaintiff bases her argument on several conclusions. First, Plaintiff alleges that the "issue of transferable skills is material if the jobs relied upon at Step [Five] of the sequential evaluation are semiskilled or skilled" (Docket No. 19, p. 8 of 12). She goes on to cite Social Security Ruling 83-10, which states that "[t]he ability to perform skilled or semiskilled work ***depends on the presence of acquired skills which may be transferred to such work*** from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work" (Docket No. 19, p. 8 of 12) (emphasis in original).

Before determining whether Plaintiff *has* transferable skills, this Court must determine whether a finding of transferable skills is even necessary to a determination of disability. Plaintiff's first conclusion, that transferability is material only if the jobs relied upon in step five of the sequential evaluation are semi-skilled or skilled, is an incorrect interpretation of the law. Step five concerns a claimant's ability to do *other work* in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Plaintiff seems to argue that it is the skill level of these other jobs that is relevant in the transferability determination (Docket No. 19, p. 8 of 12). This is incorrect. Social Security Ruling 82-41 states that transferability of skills "is only an issue when an individual's impairment(s), though severe, does not meet or equal the criteria in the Listings of Impairments in Appendix 1 of the regulations but does prevent the performance of past relevant work . . . , and that [*past relevant*] work has been determined to be skilled or semiskilled." 1982 SSR LEXIS 34, *3 (1982) (emphasis added).

Based on this law, and a full examination of the record, this Court finds that transferability of skills *is* a material issue in this case. Here, ALJ Warner determined that, although severe, Plaintiff's impairments did not meet or equal the Listings criteria (Docket No. 13, p. 37 of 434). The ALJ also found that Plaintiff was unable to return to her past relevant work (Docket No. 13, pp. 40-41 of 434).

Finally, VE Coleman described at least some of Plaintiff's past relevant work as semi-skilled (Docket No. 13, p. 280 of 434; Docket No. 14, p. 33 of 40). Therefore, transferability of skills is material in this case.

However, this materiality does not require identification of Plaintiff's *specific* transferable skills, as Plaintiff would have this Court believe. It is well established in the Sixth Circuit that Social Security regulation 20 C.F.R. § 404.1568, which discusses transferable skills, "does not explicitly mandate the enumeration of transferable skills at step [five]." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004). Furthermore, Social Security Ruling 82-41 only requires identification of transferable skills when an ALJ relies *solely* on the Medical-Vocational Guidelines in determining disability, not in cases where the Guidelines are merely used as a *framework* in making that decision. *See Wilson*, 378 F.3d at 549-50; *see also Woodruff v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 39019, *22 (N.D. Ohio 2013).

The Medical-Vocational Guidelines, more commonly known as "the Grid," "direct[] a conclusion of 'disabled' or 'not disabled' based on the claimant's age and education and whether the claimant has transferable work skills." *Wilson*, 378 F.3d at 548 (*citing Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003)). As a general rule, an ALJ "may not rely on the grids alone to meet [his] step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level." *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990). If the claimant suffers from both exertional and non-exertional impairments, the Grid may be used only as a *framework* to provide guidance for decision-making, not to direct a conclusion of disability. *Id.* "Rote application of the grid is inappropriate." *Id.* at 926. An ALJ must therefore only treat the Grid as a framework in these cases and "must rely on other evidence to

16

determine whether a significant number of jobs exist in the national economy that a claimant can perform." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008) (*citing Burton v. Sec'y of Health and Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990)). This other evidence includes the testimony of a VE. *See Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990).

The ALJ determined that Plaintiff had both exertional and nonexertional impairments (Docket No. 13, p. 37 of 434). A limitation is classified as exertional if it affects a claimant's "ability to meet the strength demands of the jobs." 20 C.F.R. § 1569a(a). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 404.1569a(a). This includes limitations involving the ability to "reach; to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch)." 1985 SSR LEXIS 20, *5. Non-exertional limitations also include fine movements of small objects, or those that require the use of fingers to pick or pinch, and any impairment of vision, speech, or hearing. *Id.* at *6.

Here, Plaintiff's exertional limitations include: (1) lifting five pounds occasionally; and (2) sitting, standing, or walking for six hours during an eight-hour workday (Docket No. 13, p. 37 of 434). Plaintiff's nonexertional limitations include: (1) only occasionally climbing stairs, balancing, stooping, kneeling, crouching, or crawling; (2) never climbing ladders and the like; (3) performing work in environments with occasional exposure to temperature extremes, humidity, respiratory irritants, and hazards; (4) wearing sunglasses; and (5) taking one unscheduled five-minute bathroom break per non-break hour (Docket No. 13, p. 37 of 434).

Given the presence of these nonexertional limitations, ALJ Warner was required to use other evidence, namely VE Coleman's testimony, to determine whether Plaintiff could perform other work. Consequently, the identification requirement of SSR 82-41 does not apply and ALJ Warner was not required to identify Plaintiff's specific transferable skills. Therefore, Plaintiff's first assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.[5]

## 2.    EMPLOYER ACCOMMODATIONS

In her second assignment of error, Plaintiff alleges that the ALJ erroneously relied on jobs identified by the VE given the fact that the VE testified that these jobs could only be performed with employer accommodations (Docket No. 19, pp. 10-11 of 12). Plaintiff references the Americans with Disabilities Act ("ADA") to support her position, stating:

> Social Security's policies, however, do not take reasonable accommodation into account.
>
> By way of contrast [to the ADA], when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of "reasonable accommodation" into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.

(Docket No. 19, p. 10 of 12). Therefore, Plaintiff alleges, the ALJ erred in relying on the VE's testimony once it was revealed that Plaintiff would require further accommodations (Docket No. 19, p. 10 of 12). Plaintiff is incorrect.

In addition to limiting Plaintiff to light work, ALJ Warner included in her residual functional

---

[5] It is worth mentioning, as Defendant points out, that even if Plaintiff's case could be decided relying solely on the Grid, Plaintiff would *still* be found not disabled. On the alleged disability onset date, Plaintiff was forty-six years old (Docket No. 13, p. 41 of 434), which, under the regulations, makes her a younger individual age 18-49. 20 C.F.R. §§ 404.1563, 416.963. She graduated from high school and has one and a half years of college education (Docket No. 14, p. 12 of 40). Under the Grid, Plaintiff would be found not disabled *with or without* transferable skills. 20 C.F.R. Part 404, subpart P, appx. 2.

capacity assessment Plaintiff's need to wear sunglasses and take unscheduled five-minute bathroom breaks every non-break hour (Docket No. 14, p. 33 of 40). Based on these limitations, VE Coleman testified that a hypothetical individual would *not* be able to return to Plaintiff's past work (Docket No. 14, p. 34 of 40). However, VE Coleman stated that there was other work that such an individual could perform, including appointment clerk and credit clerk (Docket No. 14, pp. 35-36 of 40). The VE specifically testified that these jobs would be available *even with* the need for sunglasses and five-minute bathroom break limitations (Docket No. 14, pp. 38-39 of 40).

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987). Based on the evidence contained in the record, it is clear that ALJ Warner included *all* of Plaintiff's limitations in her residual functional capacity assessment, including Plaintiff's need to wear sunglasses and take unscheduled five-minute bathroom breaks (Docket No. 13, p. 37 of 434). Plaintiff does not contest this residual functional capacity finding (Docket No. 19).

The Sixth Circuit also acknowledges that

[o]n occasion, a VE's testimony conflicts with the information set forth in the DOT. In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided conflicts with the information provided in the DOT. ALJs must also obtain a reasonable explanation for apparent conflict[s] if the VE's evidence appears to conflict with the DOT.

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603-06 (6th Cir. 2009). ALJ Warner specifically asked the VE if his testimony was consistent with the DOT, to which VE Coleman responded in the affirmative (Docket No. 14, pp. 30, 38-39 of 40). Therefore, it was proper for the ALJ to rely on the VE's testimony. As such, the Magistrate finds that Plaintiff's second assignment of error is without

19

merit and recommends that the decision of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   June 27, 2013

20

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.